1           THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION

3
                              )
4   CHARLES THURSTON           )   No. H-09-CV-3629
                              )
5                              )   HOUSTON, TEXAS
     -vs-                      )   DECEMBER 22, 2009
6                              )   10:10 a.m.
                              )
7   MERCK & CO., INC.; ELI     )
    LILLY, INC.                )
8

9
                    TRANSCRIPT OF CONFERENCE
10        BEFORE THE HONORABLE LYNN N. HUGHES

11
A P P E A R A N C E S:
12
FOR PLAINTIFF:
13     PRO SE
       BY:  CHARLES THURSTON
14     P.O. Box 2111
       Humble, Texas 77347
15     832-472-9318

16

17

18

19

20

21
       OFFICIAL COURT REPORTER:   JEANETTE C. BYERS, RPR, CSR
22

23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPH,
       TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
25

```
 1   FOR DEFENDANT MERCK:
        Goldman, Ismail, Tomaselli, Brennan & Baum, LLP
 2      BY:  LAUREN JOHNSON
             HAYLIE CROUCH
 3      2828 North Harwood
        Suite 1730
 4      Dallas, Texas 75201
        214-880-9900
 5      214-880-9901(fax)

 6
     FOR DEFENDANT LILLY:
 7      Shook, Hardy & Bacon
        BY:  KATHLEEN FRAZIER
 8           BLAKE HAMM
        600 Travis
 9      Suite 1600
        Houston, Texas 77002
10      713-227-8008
        713-227-9508(fax)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Sorry to keep you waiting, but I had

2     promised, after having avoided the phone call for a while,

3     that I would take the call at ten.  It was just work, I mean,

4     that's all, just work.

5          All right.  So we have two people from Lilly who just

6     so much admire your work as lawyers that they're here to see

7     how you do.  Do I understand that correctly?

8          MS. FRAZIER:  Yes, your Honor.

9          MR. HAMM:  Yes, your Honor.

10         THE COURT:  Okay.  We've got him, Frazier, Johnson

11    and Crouch.

12         Has anybody heard from Mr. Thurston this afternoon?

13         MS. CROUCH:  I spoke with him yesterday and he

14    confirmed that he would be here.  We talked about, you know,

15    confirming -- getting copies of medical records he has and he

16    said he would bring them with him, but I have not seen him

17    today.

18         THE COURT:  Okay.  I think I remember the extension

19    but before -- but I -- I don't know what I did with it.

20         You didn't see anybody stuck in security downstairs,

21    did you?

22         MS. CROUCH:  We did not but we've been here for about

23    an hour because we had a flight that --

24         THE COURT:  Here it is.

25         (On phone to security).

Jeanette Byers, CSR, RPR  (713)250-5087

1              THE COURT:  This is Judge Hughes.  You don't have a

2      mature gentleman wandering around lost down there, do you.

3              I'm not talking about Judge Hittner.  Do you have

4      anybody lost down there?

5              Okay.  Thank you, sir.  Bye.

6              Where are y'all from?

7              MS. FRAZIER:  We're from Shook, Hardy & Bacon here in

8      Houston.

9              THE COURT:  Okay.  Is that a law firm?

10             MR. HAMM:  Yes.

11             THE COURT:  Well, I guess he hasn't talked to y'all.

12             MS. CROUCH:  We've exchanged two letters notifying

13     him of the initial conference and then it was changed to this

14     date and then we spoke yesterday.  But that's it, other than

15     the exchanges that --

16             MS. FRAZIER:  Mr. Thurston just arrived, sir.

17             MS. CROUCH:  Oh, perfect.

18             MR. THURSTON:  Good morning.

19             THE COURT:  Just called down to the train station to

20     see if you were --

21             MR. THURSTON:  I got lost.

22             THE COURT:  I was late so you turned out not to be

23     late.  We just got together.

24             All right.  We've got Mr. Hamm, Miss Frazier,

25     Miss Johnson and Miss Crouch.

1            MS. CROUCH:  That's correct.

2            THE COURT:  And she was just saying that you have

3    some medical records.

4            MR. THURSTON:  Yes.

5            THE COURT:  I don't want to go through them right

6    now, but we're just going to talk about the case.  And these

7    two folks are from Lilly.  And they haven't appeared yet

8    because they haven't been served.

9            MS. FRAZIER:  Yeah, Lilly hasn't been properly served

10   in the suit and has not made an appearance and does not --

11           THE COURT:  They're just here to watch because they

12   think I'm such a great judge or something.

13           But these folks are from the other one, Merck.  You

14   took some -- what was it, what drug?

15           MS. CROUCH:  Zocor.

16           MS. JOHNSON:  Zocor is the name of the drug.

17           THE COURT:  Why does one take that?

18           MS. CROUCH:  It's a cholesterol-reducing medication.

19           THE COURT:  Mr. Thurston, what is it that you think

20   this drug did to you?

21           MR. THURSTON:  Caused muscle damage.

22           THE COURT:  And how do you know that it was Zocor

23   that caused the muscle damage and not --

24           MR. THURSTON:  Because it's well-known that it causes

25   muscle damage.

1          THE COURT:  Well, I know, but meningitis causes

2   insanity, sickness and death, but not everybody who has death

3   or insanity gets it from meningitis.  And everybody with

4   meningitis -- some people have it and recover perfectly.  So

5   you've taken Zocor.

6          MR. THURSTON:  Yes.

7          THE COURT:  How long did you take it?

8          MR. THURSTON:  For a year.

9          THE COURT:  And did you take it under the guidance of

10   a physician?

11          MR. THURSTON:  Yes, sir.

12          THE COURT:  Where was that?

13          MR. THURSTON:  VA Hospital.

14          THE COURT:  Here in Houston?

15          MR. THURSTON:  Yes.

16          THE COURT:  Who's your doctor.

17          MR. THURSTON:  First that gave me Zocor was

18   Dr. Walker.

19          THE COURT:  I was just curious.  I have a friend who

20   used to work out there, but I'm not sure -- I think she was

21   one of those administrator kind of doctors, didn't actually do

22   any good for anybody.

23          Then how long ago was it you quit taking Zocor?

24          MR. THURSTON:  About a year and a half --

25          THE COURT:  And are you still taking.

1          MR. THURSTON:  -- I mean about six months.

2          THE COURT:  And are you still seeing the doctors at

3    Veterans Administration?

4          MR. THURSTON:  No.

5          THE COURT:  Are you seeing any doctor?

6          MR. THURSTON:  No.

7          THE COURT:  Now, you mentioned something that Lilly

8    produced, Zyprexa.

9          MS. FRAZIER:  Zyprexa.

10         THE COURT:  Z-y-p-r-e-x-a is the traditional way to

11   spell it.  Wouldn't you hate to have to name a drug.  It's

12   like naming a street.  If you were building a subdivision in

13   Houston, try to think of a street that's not already used.

14   That's why you get all of these names after mountains and --

15         In order to succeed in a lawsuit you've got to

16   connect your current physical problems to something that

17   somebody should have done that not only is a known risk but it

18   happens to be the cause in your case and that it was

19   unreasonable and that the doctor prescribing it shouldn't have

20   prescribed it because of the risk in whatever your condition

21   was.

22         MR. THURSTON:  This doctor -- I did have high

23   cholesterol.  I was 20 points above normal, 200, and so I took

24   the cholesterol --

25         THE COURT:  What would normal be?

1          MR. THURSTON:  200.

2          THE COURT:  200.  So you were 220?

3          MR. THURSTON:  Right.

4          THE COURT:  Is that seriously -- I don't --

5          MR. THURSTON:  No, borderline.

6          THE COURT:  It's borderline?

7          MR. THURSTON:  Right.

8          THE COURT:  But the doctor performed physicals on you

9  before he prescribed it and knew whatever your conditions

10 were?

11         MR. THURSTON:  Yes.  I had extensive blood tests and

12 cholesterol showed up, total cholesterol showed up as about

13 normal.  I already knew it was.

14         THE COURT:  How did you know that?

15         MR. THURSTON:  From past experience with other

16 doctors long ago.

17         THE COURT:  And how about Zyprexa, why did you take

18 that?

19         MR. THURSTON:  The doctor claimed I had an illness,

20 which I didn't have.  And then I was transferred to the VA

21 Hospital and I was cured and had nothing to do with Zyprexa.

22 I shouldn't have been given it in the first place.  And I told

23 the doctor not to give it to me and I'd sue him if he did

24 because I got on the Internet in the hospital and I could see

25 how many lawsuits had been filed against the company and I

1   didn't want to take a drug that so many people were not happy

2   about and willing to sue the manufacturer.  But the doctor

3   prescribed it anyway.

4          THE COURT:  You took it anyway.

5          MR. THURSTON:  I didn't have any choice.

6          THE COURT:  Could you not take it?

7          MR. THURSTON:  I could not -- I did not have a

8   choice.  I had to take the drug.  The doctor and nurse came by

9   and said, "Here's what the doctor ordered.  You have to take

10  it."

11         THE COURT:  What was the illness for which it was

12  prescribed?

13         MR. THURSTON:  Schizophrenia, which I did not have.

14         THE COURT:  How long have you taken it?

15         MR. THURSTON:  Well, I'm trying to get the hospital

16  records and I --

17         THE COURT:  Well, just roughly.  They're more precise

18  than I am.

19         MR. THURSTON:  Months, but I don't know how many

20  months.

21         THE COURT:  But not like three years or something?

22         MR. THURSTON:  No.  The Zocor can be prescribed for a

23  long time.  Some patients do very well on it and some don't.

24  But the real question is how many people do badly on the

25  Zocor.

1           THE COURT:  No.  The question is whether it bothered

2     you.  Merck can kill a couple of hundred thousand people a

3     year with stuff and if they don't hurt you with whatever their

4     stuff you got, you don't have a claim.

5           MR. THURSTON:  I never had muscle damage.  It's not

6     in my family and I never had such a thing in my life.  I've

7     been always athletic and a very strong person, very

8     intelligent and I know my own body very well.  I studied

9     medicine for a long time and I knew it had to be.  As soon as

10    I realized what it was, I stopped taking it.  I got on the

11    Internet and I started researching about this drug and I found

12    a lot of things and all the symptoms matched.

13          THE COURT:  How old are you?

14          MR. THURSTON:  64.

15          THE COURT:  That's terrible.  That makes me the

16    oldest person in the room.  Close.  Sort of close.

17          Have you taken other drugs?

18          MR. THURSTON:  Yes.

19          THE COURT:  I'm talking about the last ten years.

20          MR. THURSTON:  Mostly antibiotics.

21          THE COURT:  So you do not now have a doctor's opinion

22    that the problems and weakness and pain -- is that the

23    symptoms --

24          MR. THURSTON:  Yes.

25          THE COURT:  -- that you're feeling now are

1    pharmacologically or physiologically connected to Zocor?

2              MR. THURSTON:  No, I'm not but I could obtain that.

3    But I've been very busy trying to get the 12-page document

4    that I sent you finished in time.

5              THE COURT:  You know why I personally like

6    Mr. Brokaw, he's neither a lawyer nor a doctor.

7              MR. THURSTON:  Right.

8              THE COURT:  Sure does speak a whole lot better than I

9    do.

10              MR. THURSTON:  But if you'll delay this decision

11    until I can get that information, I would appreciate that very

12    much.

13              THE COURT:  Well --

14              MR. THURSTON:  I also have found an attorney who I'm

15    talking to and I've indicated this trial that I'm hoping for

16    and he's willing to look at it closer and make a decision.

17    He's very interested.  He saw it on the Internet.  I called

18    his office and he returned my call and I outlined all the

19    points.  And he's very interested in meeting me, but he can

20    only see me after the holidays.

21              THE COURT:  That's true of almost everybody.

22              MR. THURSTON:  Right.  He can also argue in federal

23    court.  His name is Randal Kauffman.  I believe he's near the

24    Galleria.

25              THE COURT:  But it would be, I guess, good if it

1    weren't this complicated, Mr. Thurston.  Reflecting life in

2    America, litigation is complicated.  And while I would not

3    ever do anything bad to you because you didn't have a lawyer,

4    I also can't be your lawyer.  Just like I wouldn't help her,

5    I'm not going to help you.

6              MR. THURSTON:  Right.

7              THE COURT:  It's not my job.  I'm pretty good at my

8    job, but it's not helping lawyers or litigants trying to be

9    patient while I listen.

10             What's wrong with Lilly's service?

11             MS. FRAZIER:  Judge, Lilly's just never been served

12   through an authorized agent.

13             THE COURT:  You have to -- I don't know how you tried

14   to serve them, but you have to serve them a particular way.

15             MR. THURSTON:  They asked for information from the

16   hospital.  And I've written to the hospital twice and I

17   haven't received a thing.  I asked for the documents to be

18   sent to the attorney in New York and I also asked at the same

19   time to send me a copy.  That was over a month and a half ago.

20   And then I -- after a month, I haven't received anything, so

21   about a week or so ago I sent another letter asking why they

22   haven't sent it.  If they haven't, please resend it and resend

23   my copy.  I haven't received anything from them yet.

24             THE COURT:  Pretty soon we'll all be getting our

25   medical care from the post office.

1          MR. THURSTON:  I'm not too happy with their -- with

2     no response.

3          THE COURT:  I've dealt with them a good deal,

4     fortunately, only in their litigation and not needing their

5     medical care.

6          What are the symptoms that Zyprexa caused you?

7          MR. THURSTON:  Mainly sexual drive is not there.

8     It's -- actually both drugs can do the same thing.  And it

9     could be a combination, it was just so much that everything

10    just fell apart and I'm not happy about that at all.  But the

11    muscle damage is always continuous and it's painful and it --

12    for four days about a month ago I couldn't walk at all.  And I

13    treated myself with oils and vitamins and especially B

14    vitamins and that seemed to help.  That's, I believe, the only

15    reason I'm walking today is because of what I did but I still

16    can't lift my arms above my shoulders, especially my right

17    arm.  I just can't -- I can't lift it at all.  It's very

18    strange the way this attacks your muscles.  It's very strange.

19    And I've read this on the Internet.  I went through the web

20    site that had 650 people comment on this drug.  And all the

21    symptoms are very similar to mine, especially the pain below

22    the kneecaps, which is very strange.  This is very unusual.

23    And it only comes from this drug.  And the weakness in the

24    ankles is very common as well as the shoulder pain is very

25    common, very, very common.

1          THE COURT:  Mr. Thurston, the Internet is a great

2    invention but blogging it is what I call the gallop poll

3    summit way of doing research.  If somebody doesn't know

4    anything and they call somebody who doesn't know anything and

5    talk about it and you multiply that times a hundred, the sum

6    is still zero.  You actually have to have --

7          MR. THURSTON:  I've been on the Internet.  I'm a web

8    blogger.  And I've got a program with H. Telm (as understood)

9    and myself.  I have, if necessary, been on the Internet two

10   years ahead of Bill Gates.  I know exactly what to do on the

11   Internet.  I'm a very accomplished programmer.

12         THE COURT:  You can't make Wikipedia cites correct by

13   knowing how to do it.

14         MR. THURSTON:  Yes.  But I know a professional cite

15   when I see one.

16         THE COURT:  Wikipedia is a well-known site.

17         MR. THURSTON:  Very well-known.

18         THE COURT:  It's just -- the information is only

19   about 72 percent right and you never know which 72 percent is

20   right.

21         MR. THURSTON:  I probably agree with that.  I don't

22   use that.

23         THE COURT:  Blogs are just sports talk radio on the

24   Internet regardless of the topic.  So you should be very

25   careful about doing things to your body based on information

1   from chat rooms and other things.

2          MR. THURSTON:  I agree a hundred percent.  I know

3   where to stay away from certain things and I'm very confident

4   on the Internet.

5          THE COURT:  So you have a motion to dismiss.

6          MS. CROUCH:  That's correct.  I apologize.  I lost my

7   voice.

8          THE COURT:  You better buy a better grade of cigars.

9          MS. CROUCH:  I'll try to speak up.  But, yes, we have

10  a motion to dismiss on file on two grounds, one on Federal

11  Rule of Civil Procedure 9(b) based on his failure to plead

12  with particularity his cause of action, the elements of a

13  viable cause of action; and then the other is based on

14  12(b)(6) for failure to state a claim.  And basically, as I'm

15  sure you're aware, in September of 2003 with the House Bill 4,

16  it was Texas Civil Practices and Remedies Code was enacted,

17  82.07, which provides that if a warning that a company has

18  pharmaceutical products --

19          THE COURT:  All those numbers mean she has no

20  personal life.  That's what that means.

21          MS. CROUCH:  I hope not.  Maybe.

22          Basically means that all pharmaceutical products are

23  approved by the FDA, that information in the warnings that

24  accompany those products are presumed adequate.  And I don't

25  believe there's any dispute in this lawsuit that either Zocor

1    or Zyprexa labels have been approved by the FDA and,

2    therefore, under Texas law we're entitled to a presumption of

3    adequacy and, more significantly in this case with respect to

4    the facts that Mr. Thurston has alleged, we attached to our

5    motion a copy of the Zocor label which lists as its first

6    potential side effect in the warning section the risk of

7    myopathy and rhabdomyolysis, which explains that those two

8    diseases or ailments manifest themselves as muscle pain and

9    weakness so I think it --

10          THE COURT:  When Merck discovered this, what are the

11   circumstances of this side effect occurring?  First dose?

12   Second year?

13          MS. CROUCH:  I think it --

14          THE COURT:  There has to be a distribution.

15          MS. CROUCH:  Well, I mean, I think there's properly

16   different studies that say different things, but I think that

17   we just -- the way our warning reads is that with, you know,

18   continued use you may see a side effect of myopathy or

19   rhabdomyolysis.  And that the first indication that you are

20   experiencing these sort of muscle pains you should discuss

21   this with your doctor to determine whether staying on the drug

22   is appropriate for you.

23          THE COURT:  So do the studies have a slope to the

24   incidents?  Is it gradual or is it --

25          MISS JOHNSON:  Our label states that risks increase

1  with higher doses and concomitant use.

2        THE COURT:  Some side effects are heart attacks and

3  so on.  Your first sign is you're going to the floor.  Other

4  things, you start not sleeping a little or -- I don't know.

5  So with this, the side effect of muscle pain and weakness is a

6  gradual or --

7        MS. CROUCH:  It's a -- I mean, I think the studies

8  collectively, if you put them together, would show that it's a

9  gradual effect, a potential gradual effect that some

10 patients --

11        THE COURT:  Those that have the effect is gradual.

12        MS. CROUCH:  Right.  I don't think that the majority

13 of patients, I don't believe the study show that -- you know,

14 that after one time of taking the drug you're immediately

15 going to feel these muscle pains or weakness so --

16        THE COURT:  If Lilly were in the suit, would it have

17 the same problem?

18        MS. FRAZIER:  No.  Zyprexa is not a

19 cholesterol-reducing agent.

20        THE COURT:  I know, but with the regulatory

21 prohibitions.

22        MS. FRAZIER:  Yes, absolutely, 82.007 also applies to

23 Lillie's Zyprexa which is FDA approved.

24        THE COURT:  Is sexual dysfunction a listed side

25 effect?

1          MS. FRAZIER:  It is, as it is with many other drugs.

2          THE COURT:  Seems to be.  The one I like is something

3    you see the disclaimer on television that it can cause head

4    cold and menstrual cramps.  Now, that's thrown in with a whole

5    bunch of other stuff.  Isn't that sort of hard to cause?  The

6    head cold you get from a -- but menstrual cramps -- first,

7    half the population should be immune from that.  I'd hate to

8    take something and have cramps.  All right.

9          MR. THURSTON:  Muscle myopathy is the most important

10   thing that I have.

11         THE COURT:  And that's her --

12         MR. THURSTON:  Right.

13         THE COURT:  -- and her client but I can point at

14   Merck.

15         MR. THURSTON:  Right.

16         THE COURT:  Did you, more or less, follow what they

17   were saying?

18         MR. THURSTON:  Yes.

19         THE COURT:  That it's a state law that says if the

20   federal government approves a drug, the disclosures that are

21   made that are required by the FDA are presumptively adequate

22   and --

23         MR. THURSTON:  I understand all that precisely.

24         THE COURT:  Okay.  Later on they would get to it's

25   your responsibility, not to say other people had this problem,

1  but that you have it and that you have it as an direct

2  consequence of taking that drug not of something else.

3          MR. THURSTON:  Right.

4          THE COURT:  And, as I understand it, you do not now

5  have a physician who will say that he's performed the

6  responsible tests for either of these conditions and that

7  based on his knowledge of the volume and timing of your use,

8  your preexisting condition and reasonable medical probability,

9  your muscle weakness is a result of the drugs.

10          MR. THURSTON:  I do not, but I can get it.

11          THE COURT:  Well, even with that as long it fits the

12  statute, that's not enough to overcome the statute.  You've

13  got to show that Merck knew that a significant number of users

14  in the age group that it was intended for at the dosage that

15  it was intended for would develop your condition somehow

16  making them having been fully aware that it was an undisclosed

17  risk.

18          MR. THURSTON:  Well, my age group has something to do

19  with that, also.  It's now known that they've added the 65 or

20  older.  And when I was taking the drug I was 62, and -- but

21  still I was close to 65.

22          THE COURT:  65 and older is like being able to vote

23  at 18, which I still think is a mistake.  I had to wait until

24  I was 21, so should everybody else.  You weren't 65.  The

25  warning says 65 or older.

1          MR. THURSTON:  There wasn't a warning on any age --

2          THE COURT:  Now it does.  And, Mr. Thurston, only

3    politicians can go back and pretend that it's 1950 and we're

4    going to apply 2009 standards to what happened back then.  You

5    have to apply the standards to what you did at the time you

6    did it --

7          MR. THURSTON:  Right.

8          THE COURT:  -- because nobody's prescribing you this

9    drug now, are they?

10         MR. THURSTON:  No.

11         THE COURT:  And nobody's giving it to you.

12         MR. THURSTON:  No one will ever give it to me again.

13   I'll never take it.

14         THE COURT:  Well, if you won't take it, then no point

15   in giving it to you.  My point is, when you took the drug it

16   didn't even say don't do it over 65.  It now does and you're

17   not yet over 65 so it just doesn't matter.

18         MR. THURSTON:  Yes, it does.  It generally -- the age

19   limit will probably be lowered in the future to 62.

20         THE COURT:  And it won't matter because you're not

21   taking it and you're not 62 anymore.  This is not -- I'm not

22   Geraldo.  This is not about sharing feelings and what may

23   happen.  It's about actual medical, scientific, physiological,

24   pharmacological facts.  It's not just you're upset because you

25   had an adverse outcome from a medical procedure.  You probably

1   know with your maturity there are no drugs without side

2   effects.  There's no operations without risks.  There's

3   probably not even a physical that you get without some risk.

4   They take blood, they can mess it up.  That's what life's like

5   itself.  The law is not here just to give you a bunch of money

6   from pharmaceutical companies who actually get it from people

7   like you.  The rules are there in case somebody does something

8   that can be objectively established who was beyond the limit

9   set by the law, not that you're unhappy.  I'm unhappy about a

10  lot of things, unfortunately -- probably fortunately.  There's

11  no law that would allow me to recover from my unhappiness.  So

12  it's not that Merck is evil -- and they may be.  I don't care.

13  Bad people are right, good people are wrong all the time.  I

14  deal with people, neither side has done anything wrong, but

15  somebody has to share a substantial loss.  Justice is as cold

16  as a mother-in-law's love.  Trying to be precise we apply

17  established rules to the known facts.

18          So the question is:  Was there something that Merck

19  should have known when you took the drug that would have made

20  it dangerously unreasonable and they knew at the time and

21  didn't disclose it to the FDA and all kinds of stuff like

22  that, which is virtually impossible.

23          MR. THURSTON:  Yes, muscle biopsy.

24          THE COURT:  That doesn't prove what Merck knew or

25  could have known or what the FDA knew or should have known.

1          MR. THURSTON:  My blood was tested for systatisfine

2    (as understood) and it never appeared because the doctor would

3    have stopped the drug if it did.  But now we know, what the

4    Canadians studied, that it takes a muscle biopsy to check for

5    this enzyme in the muscle itself.  That's the only way you can

6    determine that there's muscle damage.  And I never had a

7    biopsy while I was on this drug and, therefore, it was unsafe

8    for me.

9          THE COURT:  That's a medical problem.  You can sue

10   the VA, probably wouldn't do any good, but Merck didn't

11   prescribe it, Merck compounded it.  You had what the law

12   describes euphemistically as a learned intermediary.  The law

13   protects you from bad drugs by regulating the drug

14   manufacturers, the pharmacists and the physicians before you

15   get three regulated entities handling it.  But if you're

16   unhappy that you were not properly tested, Merck doesn't test

17   people.

18         MR. THURSTON:  No, I was not properly tested.

19         THE COURT:  They sit in Michigan and make pills.  But

20   that's a problem between you and the VA, not between you and

21   Merck and Lilly.

22         MR. THURSTON:  I feel if a drug damages your body,

23   you should get compensation; just like if somebody hits you

24   with an automobile, you should get compensation.

25         THE COURT:  And that's a good feeling.  It's just not

1    the law.  People don't feel like they ought to have to pay

2    their mortgage.  It just doesn't translate into something that

3    can be enforced in a court of law.  And if that had been the

4    rule for a last quarter of a century, you would probably be

5    dead because many of the things that keep us alive could not

6    have been produced economically, you couldn't afford it or

7    they wouldn't have been able to find even a market to produce

8    them and they wouldn't have produced them.  That's not free

9    money, it comes from the consumers of drugs.

10          You've already seen the quality of government, quote,

11   unquote, free medical care.  First you had to go get shot at

12   to get it in the first place.  And then that hardly makes it

13   free, but the quality is something less than you deserve as a

14   veteran.  We should give you a credit card and let you go to

15   any doctor you want to get what you need.  So that's the legal

16   posture of the case.

17          They've got a statute that says FDA approves it, it's

18   okay.  There's a statute that says if the doctor stands

19   between you and them and looks at you and looks at the drugs

20   and knows the warnings and understands, perhaps better than

21   you do, what the risks reveal by the warnings are, then

22   they're not liable because the doctor made a mistake in giving

23   it to an unsuitable patient.

24          And then, of course, there is the question of whether

25   your problems are, in fact, caused by Zocor.  And the papers

1    you filed, these nice lawyers say, have not described

2    exceptions to those statutes or even the physical circumstance

3    of causation sufficiently.

4         When do you think you're going to talk to this

5    lawyer?

6         MR. THURSTON:  After January 1st.  That's the lead I

7    had so far.  He seems very interested.

8         THE COURT:  Okay.  So we're already about a month

9    after your motion to dismiss was ready; right?

10        MS. CROUCH:  After it was filed?

11        THE COURT:  No, after -- 20 days after it was filed.

12        MS. CROUCH:  Oh, yes, we are because there was an

13   extension.

14        THE COURT:  30 days or so.

15        Mr. Thurston, I'm going to extend the time for you to

16   respond to Merck's motion to dismiss until January 11th.  That

17   gives you about three times the rule.

18        MR. THURSTON:  That should do it.

19        THE COURT:  But --

20        MR. THURSTON:  I'm not an attorney.  And I appreciate

21   that.

22        THE COURT:  I understand.  I can't just keep being

23   nice to you.  For one reason, then they'll start expecting me

24   to be nice to them and I can't do that.

25        MR. THURSTON:  I understand.

1        THE COURT:  It would ruin my reputation, if nothing

2  else.  Do you have any questions?

3        MR. THURSTON:  Not really.  I thought my report was

4  pretty concise.

5        THE COURT:  Okay.  I think we're getting everything

6  that you filed.

7        MR. THURSTON:  Okay.

8        THE COURT:  We seem to be getting it.

9        MS. CROUCH:  We received his response, correct, to

10  the motion to dismiss.

11        THE COURT:  Is that the one that says it's a lot of

12  crap?

13        MS. CROUCH:  Just making sure.  So is the extension

14  an opportunity for us --

15        THE COURT:  An analysis of your work.

16        MS. CROUCH:  It was hard to swallow, but I understand

17  from his perspective why he thought that --

18        THE COURT:  I had a guy with five murder convictions.

19  I wasn't something, but I was grouchy.

20        MS. CROUCH:  Can I be clear, are you extending his

21  time to file another -- an additional response on his own

22  behalf or are you anticipating that his next response should

23  be from an attorney?

24        THE COURT:  For a further response.

25        MS. CROUCH:  Further response.

1              THE COURT:  However, I'm not limiting him.  And then

2    I'll have to look at it then.

3              MR. THURSTON:  Okay.

4              THE COURT:  And just so you understand, they're not

5    really here because -- was it Rule 4 where all the -- how you

6    have to serve them?

7              MS. FRAZIER:  Yes.

8              THE COURT:  And that thing about principal place of

9    business is kind of tricky.  It's where they say their

10   principal place of business is.  Lots of people sue Dow

11   Chemical because their largest plant is down there.

12             MR. THURSTON:  I don't understand what you're saying,

13   no.

14             THE COURT:  Well, you've got to serve them the way

15   the rule prescribes which talk about president, vice president

16   or secretary or some registered agent.  And you've got to

17   serve it on them by a process server, deputy sheriff or

18   private process server.  I don't even know where Lilly is, in

19   Chicago or Indianapolis or somewhere.

20             MS. FRAZIER:  Indianapolis.

21             THE COURT:  Anything else?

22             MS. CROUCH:  I don't believe so at this time.  We'll

23   just wait on additional response.

24             THE COURT:  Anything else?

25             MR. HAMM:  I don't think so.

1          MS. FRAZIER:  No.

2          MR. HAMM:  No.

3          MR. THURSTON:  No.

4          THE COURT:  All right.  Thank you for coming down.

5          MS. CROUCH:  Thank you for having us.

6          (Court recessed at 11:16 a.m.)

7

8

9

10          I certify that the foregoing is a correct transcript
from the record of the proceedings in the above-entitled
11    matter.

12                              /s/
                       _____
13                              JEANETTE BYERS, RPR
                                August 3, 2010

14

15

16

17

18

19

20

21

22

23

24

25